# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

JOSEPH JOHNSON,        )
       )
        Plaintiff,        )
       )
v.        )     Case No.: 2:16-cv-01069-JEO
       )
FAIRFIELD SOUTHERN        )
COMPANY, INC.,        )
       )
        Defendant.        )

## MEMORANDUM OPINION[1]

The court has before it the January 31, 2018 motion for summary judgment and the March 2, 2018 motion to strike filed by Defendant Fairfield Southern Company ("FS") (Docs. 37, 44).[2] Both motions have been fully briefed (Docs. 38, 40, 43, 45, 46) and are now under submission. For the reasons set forth below, both motions are due to be granted.

## I. PROCEDURAL HISTORY

On June 30, 2016, Plaintiff Joseph Johnson filed a complaint against Defendant FS stating two causes of action. (Doc. 1). Count one alleges unlawful

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 13).

[2] All evidentiary citations refer to the document and page number provided by CM/ECF, the court's electronic document filing system, except for citations to depositions, which refer to the page number provided on the deposition transcript, and affidavits, which refer to the paragraph number in the affidavit.

race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and count two alleges a civil conspiracy. (*Id.*). On August 15, 2016, Defendant moved to dismiss count two of the complaint. (Doc. 7). Plaintiff responded to this motion by stipulating to the dismissal of his civil conspiracy claim with prejudice, and the court dismissed this claim. (Docs. 12, 14).

Defendant moved for summary judgment on the remaining Title VII claim. (Doc. 37). Defendant contends summary judgment is due to be granted in favor of FS because (1) Plaintiff cannot establish a prima facie case of race discrimination in his termination; (2) FS acted for legitimate, nondiscriminatory reasons and Plaintiff cannot show the reasons are a pretext for intentional race discrimination; and (3) Plaintiff released his claims against FS. (*Id.* at 2). Additionally, Defendant contends Plaintiff cannot recover back pay or front pay after August 15, 2015, because his position would have been eliminated on that date. (*Id.*). Plaintiff filed a brief and evidence in opposition to the motion (doc. 41) and Defendant filed a reply brief (doc. 43).

With its reply, Defendant also filed a motion to strike portions of the two affidavits submitted by Plaintiff in opposition to summary judgment. (Doc. 44). Plaintiff filed a response in opposition to the motion to strike (doc 45) and Defendant filed a reply (doc. 46). The court begins with the motion to strike and then addresses the motion for summary judgment.

## II.  MOTION TO STRIKE

Defendant asks the court to strike portions of two affidavits of former employees Anthony Olds and Dwight Smith.  (Doc. 44).  The affidavits were submitted by Plaintiff in opposition to summary judgment.  (Doc. 42-1 ("Olds Aff.") at 2-5; Doc. 42-3 ("Smith Aff.") at 2-4).  Defendant contends the court should strike the affidavits in part because they contain statements that are (1) conclusory and lack foundation in that they are not based on personal knowledge, (2) hearsay, and (3) irrelevant.  (*Id.*).  The court finds that the motion to strike is due to be granted.

"A district court has broad discretion in determining the admissibility of evidence" on a motion for summary judgment.  *Hetherington v. Wal-Mart, Inc.*, 511 F. App'x 909, 911 (11th Cir. 2013).[3]  Under Federal Rule of Civil Procedure 56(c)(4) "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  "[C]onclusory allegations without specific supporting facts have no probative value."  *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

---

[3] Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

The court agrees with Defendant that the objected-to portions of the affidavits are inadmissible. The statements in both Olds' and Smith's affidavits regarding their conclusions that widespread prejudice and/or discrimination occurred at FS[4] are conclusory and do not contain the necessary specific supporting facts. Neither affiant identifies the specific people with the alleged racial animus but merely refers to "supervisors" in general. Where some specifics are provided, the necessary context to support the allegations is absent.

Additionally, the court rejects Plaintiff's argument that the testimony contested by Defendant is admissible as lay opinion evidence under Federal Rule of Evidence 701. (Doc. 45 at 5). Federal Rule of Evidence 701 allows a lay witness to testify in the form of an opinion, provided such testimony "is limited to" those opinions or inferences that are: "(a) rationally based on the witness's

---

[4] Because the affidavits do not contain numbered paragraphs, the court cannot easily highlight the exact statements that are inadmissible. That being said, the statements include those such as the following: "there were a few other times I saw supervisors giving white employees special treatment . . . [and] [t]he only explanation for this unfair treatment is prejudice," (Olds Aff. at 4); "[p]rejudice seems normal at Fairfield Southern and the black employees have no way to fight it," (*id*.); "I have personally witnessed prejudice by the supervisors many times," (*id*. at 3); "[t]here are plenty of white employees who tear equipment up, derail cars, and hit other cars but none of them get fired" and black employees who make the "same mistake" do get fired or are fired "for no reason," (*id*.); "I watched supervisors use harassment, discrimination, and intimidation to keep black employees quiet;" (Smith Aff. at 2); "[b]lack employees were often fired for one mistake, while white employees could tear things up and skip work without even having to worry about being suspended," (*id*.); "[t]he supervisors use intimidation to keep the black people from telling what really goes on out there," (*id*. at 3); "[a]s a black employee, I was expected to stay in my place and not challenge my supervisors unless I wanted to risk my job," (*id*.); "Unfortunately, if you were a black employee at Fairfield Southern, you were considered to be guilty until proven innocent. Lawsuits were usually not filed over these incidents because black employees were afraid of being fired if they spoke up." (*Id*.).

4

perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Although Plaintiff focuses on the "witness's perception" requirement in 701(a), it is actually the "helpfulness" requirement in 701(b) that is not met by the testimony at issue. Subpart (b) is designed to "provide assurances against the admission of opinions which would merely tell the jury what result to reach." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (quoting Fed. R. Evid. 701 Advisory Committee Note on 1972 Proposed Rule); *see also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997) (same).

In the context of employment discrimination cases, the Eleventh Circuit has cautioned that "a discharged employee's mere suspicion of . . . discrimination, unsupported by personal knowledge of discrimination, will not constitute [proof of] pretext." *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1026 (11th Cir. 1994) (citing *Slaughter v. Allstate Insurance Co.*, 803 F.2d 857, 860 (5th Cir. 1986)). The Second Circuit explained this principle as follows:

> [I]n an employment discrimination action, Rule 701(b) bars lay opinion testimony that amounts to a naked speculation concerning the motivation for a defendant's adverse employment decision. Witnesses are free to testify fully as to their own observations of the defendant's interactions with the plaintiff or with other employees, but "the witness's opinion as to the defendant's [ultimate motivations] will often not be helpful within the meaning of Rule 701 because the jury will be in as good a position as the witness to draw the inference as to

> whether or not the defendant" was motivated by an impermissible
> animus. *Rea*, 958 F.2d at 1216. . . . A jury can draw its own
> conclusions "from observed events or communications that can be
> adequately described" to it. . . . But [a witness's] speculative lay
> opinion that [a supervisor's conduct] is attributable to race, rather than
> anything else, is not helpful . . . because it "merely tells the jury what
> result to reach." *Id.* at 1215.

*Hester v. BIC Corp.*, 225 F.3d 178, 185 (2d Cir. 2000).

The objected-to opinion testimony of Olds and Smith does exactly what Rule 701(b) attempts to prevent. The testimony relaying the subjective opinions of Olds and Smith as to why certain decisions were made are inadmissible. There are a multitude of reasons why the actions could have been taken and Olds and Smith may not testify as to the decision maker's ultimate motivations. For the foregoing reasons, Defendant's motion to strike is due to be granted.

## III. MOTION FOR SUMMARY JUDGMENT

### A. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it

believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## B.    STATEMENT OF FACTS[5]

FS is owned by Transtar and operates a rail line within United States Steel Corporation's Fairfield Works in Birmingham, Alabama. (Doc. 39-1 ("Rutherford Decl.") ¶ 2; Doc. 38 at 3). The bargaining unit employees at FS are represented by the United Steelworkers of America union and the terms and conditions of their

---

[5] These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

employment are governed by a collective bargaining agreement. (Doc. 39-2 ("Johnson Dep.") at 82).

Plaintiff, an African American, was hired on December 16, 2009, as a helper trainee. (*Id*. at 81; Doc. 39-4 at 55). Plaintiff was a union employee and his employment was governed by the collective bargaining agreement. (Johnson Dep. at 82). After approximately six months, Plaintiff became a helper. (*Id*. at 88). Helpers work with train operators in a two-man crew. (*Id*. at 89). The train operator moves railcars around the Fairfield Works with a remote control, and the helper directs the safe movement of the rail cars, operates railroad switches, and secures railcars. (*Id*.).

## 1. FS's rules and disciplinary process

Because of the inherent dangers of working in and around trains, FS has a number of safety rules to help prevent accidents to people and property. Cardinal Rules are directed at safety and cover situations when a failure to follow a rule can result in substantial risk of harm or person or property and are identified as life threatening rules. (*Id*. at 90-91; Doc. 39-2 at 115-17; Doc. 39-6 ("Dalton Dep.") at 48). Operating Rules are rules, including safety rules, specific to a facility. (Dalton Dep. at 48). General rules are basic safety rules. (*Id*.). Plaintiff admits he was trained on all safety rules. (Johnson Dep. at 90-91).

FS follows a disciplinary process for violations of safety rules, including grievance and arbitration procedures dictated by the collective bargaining agreement. (Doc. 39-5 ("Weideman Dep.") at 67-77; Doc. 39-5 at 58-59). As relevant here, under the collective bargaining agreement, an employee suspended for five days or more may have the union request a preliminary hearing, commonly referred to as a 9(b) hearing. (*Id*.; Doc. 39-7 ("Baginski Dep.") at 44). If the outcome of the hearing is unsatisfactory to the employee, the union may file a grievance, which can include another hearing, appeal and arbitration. (Weideman Dep. at 70-77; Doc. 39-5 at 58-59; Baginski Dep. at 44, 105).

### 2. July 19, 2011 accident

On July 19, 2011, Plaintiff uncoupled a railcar from another train and failed to secure the handbrake, as required. (Johnson Dep. at 22, 28, 30). Instead, Plaintiff put air on the railcars and then put the railcar into emergency. (*Id*. at 93). Although Plaintiff's actions should have kept the railcar in place, unbeknownst to Plaintiff, the air brake pipe was broken and failed to prevent the railcar from rolling. (*Id*. at 93-94, 119-20; Weideman Dep. at 39-40; Doc. 39-4 at 48). As a result, the railcar rolled over twenty feet until it hit another car. (Johnson Dep. at 95). There was no damage to the cars or injury to any person as a result of the accident. (Doc. 42-3 ("Smith Aff.") at 2; Weideman Dep. at 117-18).

Anthony Olds, the train operator working with Johnson at the time of the accident, called David Tarwater, the Superintendent of Transportation, to inform him about the accident.[6] (Johnson Dep. at 95-96; Doc. 39-4 ("Tarwater Dep.") at 11). When Tarwater arrived,[7] Johnson admitted he did not secure the handbrake as required. (Johnson Dep. at 97-99). Tarwater directed Plaintiff and Olds to submit to a drug test. (*Id*.). Plaintiff initially refused to take the drug test, and Plaintiff and Tarwater got into a "heated conversation" about it. (*Id*. at 97-100). Plaintiff asked Tarwater why he had to take a drug test when he heard that Joey Simmons, a white helper, was not required to take a drug test only days before when he allegedly failed to properly apply a hand brake. (*Id*. at 71-72; 97-102). Tarwater refused to discuss the situation regarding Simmons, and Plaintiff ultimately submitted to the drug test and passed. (*Id*.).

### 3. The accident investigation

A meeting was held shortly after the accident. From what the court can glean from the record, Plaintiff, Tarwater, Clarence Rutherford, the General Superintendent for FS, Tommy Hosmer, a manager on duty at the time of the accident, and David Weideman, the Director of Human Resources and Labor

---

[6] Anthony Olds is African American and David Tarwater is white.

[7] Tarwater testified this was his real first encounter with Plaintiff, however, stated he had probably had a conversation with him at some time previously, but he could not recall it. (Tarwater Dep. at 50).

Relations, attended the meeting. (Rutherford Decl. at 3; Johnson Dep. at102-03; Tarwater Dep. at 101; Doc. 39-8 ("Hosmer Dep.") at 16-19; Weideman Dep. at 9, 119-20). Plaintiff described the meeting as follows:

> [T]hey asked me about the incident and what happened. I told them what happened, that I didn't tie a hand brake.[8] And they told me it was required under the rules, you had to take your drug test. And Clarence Rutherford asked me did I want to come up there and talk to the new what they call cubs, the new trainees about my situation, incident what happened. And I asked him was I going to get paid for it, and he told me no. And I told him I wasn't going to do it unless I get paid for it. . . . [T]hey were saying that – Tarwater said I laughed when he asked me something. He basically asked me was – do you want to get home safely to your family, and that sounded kinda crazy coming from him because we had just got into a heated conversation [about the drug test] . . . so I knew he wasn't worried about my safety. So I kind of looked at him and said, yeah, I want to get home safely to my family, and they considered that as laughing,[9] which I know is not a laughing matter. Of course I want to get home safe to my family.

(Johnson Dep. at 104-05). When asked in his deposition if he laughed in response to Tarwater's question, Plaintiff stated, "No, I just made a huh noise like that, but actually laughing, no I didn't." (*Id*. at 105).

Plaintiff testified Tarwater and Rutherford did not visibly react to him making the noise. (*Id*.). Rutherford testified, however, "Johnson's poor attitude about his safety violation was very concerning, and I had never witnessed an

---

[8] Plaintiff admitted he stated at the meeting that he made a conscious decision not to apply the handbrake and that everyone does it that way. (Johnson Dep. at 136-37).

[9] In his brief in opposition to summary judgment, Plaintiff states "he referenced the belief [that he laughed] during his deposition testimony because he knew it had been later raised in the EEOC process," (doc. 41 at 6-7), but the citations given by Plaintiff do not support this statement and the court cannot find any other evidence to support it.

employee laugh and express no remorse for a Cardinal Rule violation." (Rutherford Decl. ¶ 7). Likewise, Tarwater testified he was disappointed in Johnson's "cavalier attitude" towards safety, especially because he had personally been involved in fatalities in the rail industry and safety is very serious. (Tarwater Dep. at 48-50).

Additionally, Rutherford testified he was "very disappointed" when Johnson refused to talk to other employees about his safety violation. (Rutherford Decl. ¶ 8). Rutherford used the process to help prevent future accidents and as a way to mitigate discipline. (*Id*.). He used the process before Johnson's accident and after the accident.[10] (*Id*.). No employee had ever refused the request and Rutherford believed Johnson's behavior showed he did not understand the severity of his conduct. (*Id*.). Plaintiff admitted Rutherford "got kind of mad when [he] said [he] wasn't going to come talk to the trainees about my incident if [he] wasn't going to get paid for it." (Johnson Dep. at 103).

### 4. Plaintiff's suspension, disciplinary meeting and termination

On July 22, 2011, Tarwater issued Plaintiff a letter detailing the findings of the investigation and Plaintiff's discipline. (Doc. 39-2 at 123-24). The letter stated FS determined the following rules were violated by Plaintiff's "conscience [sic] decision not to apply the hand brake":

---

[10] Johnson testified he had never heard of anyone else being asked to do this as part of their discipline. (Johnson Dep. at 106).

- Cardinal Rule 19: Railroad equipment must not be left unsecured. Handbrakes, blocking or both must be used to prevent inadvertent movement.

- Operating Rule 4.1: A single car must always be left with handbrake applied.

- Operating Rule 4.12: When cars are left unattended on a descending grade, train crews must test handbrakes prior to uncoupling from cars to be left standing to ensure adequate handbrakes are applied to prevent movement with air brakes released.

- General Regulation 841: Helpers are responsible for cars that they are to secure, according to the rules.

- Notice FS-46: When placing cars on track, prior to cutting away (detaching) from cars to be left standing the following procedure must be performed. . . .  Apply the proper amount of handbrakes on cars left to be standing. . . . .  Allow air brakes on any standing portion of cars to go into emergency when cutting away from cars.

- General Rule 1.7.4 (G-4): Employees who are insubordinate, dishonest, quarrelsome or otherwise vicious or who are careless of safety of themselves or others or who do not have or fail to exercise good judgment or who fail to expedite the handling and movement of traffic or who fail to cooperate with other employees in the performance of their duties will not be retained in the service.

- General Rule 1.7.9 (Rule G-9): Disloyalty, dishonesty, desertion, intemperance, vicious, or uncivil conduct, insubordination, in competency, willful neglect, inexcusable violations of rules resulting in endangering, damaging, or destroying life or property, making false statements or reports, or concealing the facts concerning matter under investigation will be grounds for dismissal.

(*Id*.).  The letter concluded by stating Plaintiff would be held out of service for five days subject to dismissal.  (*Id*. at 124).

Under the collective bargaining agreement, the union requested a disciplinary meeting, or 9(b) hearing, on behalf of Plaintiff between FS and the union.  (Tarwater Dep. at 54).  Because the union requested the meeting, the union was responsible for notifying Plaintiff when the hearing was scheduled.  (Weideman Dep. at 23).  Plaintiff was held out of work until the meeting.  (Rutherford Decl. ¶ 11).

The hearing was rescheduled numerous times for various reasons.  Johnson's hearing was first scheduled for July 28, 2018, but it was cancelled because the Director of Human Resources was on vacation.[11]  (Johnson Dep. at 143; Doc. 39-2 at 134).  The hearing was rescheduled for August 1, 2018, but it was cancelled when Plaintiff failed to attend.  Plaintiff testified he was out of town and he did not know about the hearing because his telephone fell into water.  (Johnson Dep. at 145-46; Doc. 39-2 at 134).  The hearing was rescheduled for August 29, 2011, but was cancelled again because Tarwater was sick.  (Johnson Dep. at 146-47; Doc.

---

[11]  Defendant contends the meeting was cancelled because of Plaintiff's car trouble, (doc. 38 at 13 ¶ 41), but Plaintiff testified he called Anthony Dean, the union secretary, to inform him he was having car trouble, and Dean told him the meeting was cancelled because the Director of Human Resources was on vacation, (Johnson Dep. at 142-43).

39-2 at 134).  A fourth date was selected for September 6, 2011, but FS cancelled the hearing for an unknown reason.  (Johnson Dep. at 147; Doc. 39-2 at 134).

The hearing was rescheduled yet again for October 4, 2011.  (Doc. 39-2 at 132, 135).  According to Plaintiff's notes he took at the time, Plaintiff could not attend the meeting because he started a new job that week and could not leave.[12]  (*Id*. at 135).  Regardless of the reason he was not present,[13] the decision was made to go forward with the 9(b) hearing without Plaintiff.  (Rutherford Decl. ¶ 12).

At the meeting, Tarwater read the July 22, 2011 letter explaining the rules Johnson violated by his actions on July 19, 2011.  (Doc. 39-2 at 123-24, 132).  Tarwater discussed the meeting following the incident and relayed Johnson's statement that "he made a conscious decision not to apply the handbrake and that everybody does it that way."  (*Id*. at 132).  Tarwater further stated "management tried to bring light on how serious this violation was by talking about different scenarios that could have happened" but that Johnson "just laughed and thought it was funny."  (*Id*.; *see also* Doc. 39-6 at 75).  Tarwater relayed Rutherford's request for Johnson "to speak to FS employees about the potential injury or fatality that could have taken place because of the incident" and Johnson replied "it's not his

---

[12] Plaintiff testified he could not remember why he missed the meeting, other than what was in his notes.  (Johnson Dep. at 123).

[13] It is unclear whether anyone at FS knew why Plaintiff could not attend the hearing.  (*See* Tarwater Dep. at 124; Weideman Dep. at 120). A union representative commented to Weideman that they "just weren't able to get [Plaintiff] there for a meeting."  (Weideman Dep. at 120).

job" and "asked if he was going to get paid more money for doing it." (Doc. 39-2 at 132). The union asked that Johnson be reinstated and made whole for all money lost while out of service. (*Id*.).

After the meeting, Rutherford made the decision to terminate Johnson. (Rutherford Decl. ¶ 13). Tarwater and Weideman supplied input to Rutherford, and he discussed the decision with Dave Gevaudan, Rutherford's superior, and all were in agreement. (*Id*.). Rutherford stated the following "key factors" went into his decision: (1) Johnson's poor attitude towards safety; (2) the way he responded to Rutherford's request to talk to other employees about the safety violation; (3) the seriousness of his intentional conduct; and (4) his failed to fully cooperate in the attempts to hold a meeting. (*Id*.).

On October 5, 2011, Tarwater notified the union that Johnson's discipline was converted to a discharge. (Doc. 39-4 at 53). Johnson did not recall talking to his union representative after his termination, and it is undisputed he did not appeal his discipline through the union grievance procedures. (Johnson Dep. at 84-87).

### 5. EEOC charge and lawsuit

Johnson filed an EEOC charge on January 18, 2012, alleging discrimination on the basis of his race. (Doc. 39-2 at 144). On September 30, 2015, the EEOC notified FS of its finding that "there is reasonable cause to believe that [FS] suspended and discharged [Johnson] based on his race, Black, in violation of Title

VII" because "a similarly situated White employee was not similarly suspended and discharged." (Doc. 39-7 at 45-46). After efforts at conciliation failed, the EEOC issued Johnson a notice of his rights to sue on April 5, 2016. (Doc. 39-2 at 146). Plaintiff timely filed the instant complaint on June 30, 2016. (Doc. 1).

## C.    DISCUSSION[14]

Title VII makes it unlawful for employers to discharge or otherwise discriminate against an employee because of race. 42 U.S.C. § 2000e. Absent direct evidence of discrimination, a plaintiff may prove his or her case through circumstantial evidence using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). The plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Id*. After a prima facie case is established, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the employment decision. *Wilson*, 376 F.3d at 1087. This burden involves no

---

[14] The court rejects Defendant's argument that Plaintiff released his claims against FS when he signed a release stating he authorized Walter Coke "to obtain the facts concerning my past employment" and he "release[d] from all liability or responsibility those persons or organizations supplying such facts." (Doc. 38 at 31; Doc. 39-2 at 111). FS failed to establish it was a party intended to be released from the release signed by Johnson. *Pierce v. Orr*, 540 So.2d 1364, 1367 (Ala. 1989) (contracts of release must have effect according to their terms and the intentions of the parties); *Ford Motor Co. v. Neese*, 572 So. 2d 1255, 1257 (Ala. 1990) (rejecting Ford's argument that the intentions of the parties to the settlement agreement must be determined from the unambiguous terms of the release itself). The release clearly was intended to release Walter Coke and unnamed third parties from liability for supplying information concerning Johnson's employment records. Nothing in the document releases claims against unnamed parties regarding discrimination or wrongful termination. This is especially true in light of the fact that at the time Johnson signed the release his EEOC charge was pending against FS. (*See* Doc. 39-2 at 144-46).

credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, (1993), and has been characterized as "exceedingly light." *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983). As long as the employer articulates "a clear and reasonably specific" non-discriminatory basis for its actions, it has discharged its burden of production. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). After an employer articulates one or more legitimate, non-discriminatory reasons for the employment action, the plaintiff must show the proffered reason was a pretext for illegal discrimination. *Id.* If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Although the burden of production shifts back and forth, the ultimate burden of persuasion remains with the plaintiff. *E.E.O.C. v. Joe's Stone Crabs, Inc.,* 296 F.3d 1265, 1272 (11th Cir. 2002).

Additionally, the court is mindful that in *Sims v. MVM, Inc.,* 704 F.3d 1327, 1332–1333 (11th Cir. 2013), the Eleventh Circuit clarified that the *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Rather, "[t]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue

concerning the employer's discriminatory intent." *Id.* A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker. *Id.; see generally Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).

### 1. Prima facie case of discrimination

Only one element of the prima facie case is at issue. Defendant contends Plaintiff's prima facie case fails because he cannot establish a similarly situated comparator who was treated more favorably than he was treated. (Doc. 38 at 21-28). The employees identified by a Title VII plaintiff as comparators must be similarly situated in all relevant respects. *Wilson*, 376 F.3d at 1091; *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). The Eleventh Circuit has held this to mean that "[t]he comparator must be nearly identical to the plaintiff." *Wilson*, 376 F.3d at 1091; *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia*, 171 F.3d at 1368 (quotations omitted). Thus, the Eleventh Circuit requires "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing employers' reasonable decisions

and confusing apples with oranges." *Id*. Even if a plaintiff and comparator are similar in some respects, differences in their overall record may render them not "similarly situated" for purposes of establishing a prima facie case. *See, e.g., Knight v. Baptist Hosp. of Miami, Inc*., 330 F.3d 1313, 1316–19 (11th Cir. 2003) (the employee and comparator who committed the same act were not similarly situated because the comparator's overall record was better).

Plaintiff identifies the following four comparators for purposes of summary judgment: Scott Herring, Travis Lansford, Garrick Pennington and Joey Simmons.[15] (Doc. 41 at 20-25). Plaintiff also identified Scott Brown as a comparator in his deposition, but his brief does not address Brown so the court assumes Plaintiff abandoned this argument. *See Powell v. Am. Remediation & Envtl., Inc*., 61 F. Supp. 3d 1244, 1252, n.9 (S.D. Ala. 2014) ("Where a non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."). As to the other four individuals, the undisputed evidence reveals that none of these alleged compactors fits the standard established by the Eleventh Circuit.

---

[15] It is undisputed all the comparators identified by Plaintiff are white.

Before addressing the alleged comparators individually, the court first turns to Plaintiff's arguments that the court should disregard some of the reasons given by FS for his termination in the comparator analysis. (Doc. 41 at 18-22). Specifically, Plaintiff contends that it is disputed as to whether Johnson fully cooperated with attempts to conduct a hearing, (*id*. at 18-19), and that Johnson's alleged cavalier attitude toward safety and refusal to mitigate were after-the-fact reasons for his termination, (*id*. at 20-22). Plaintiff does not cite to any case law supporting his argument that because he disputes the articulated reason for his termination the court should disregard those reasons in analyzing the comparator evidence, and the court knows of none. Instead, these arguments more logically support Plaintiff's pretext argument that Defendant's proffered reasons for his termination are unworthy of credence. The court, therefore, will consider them in its pretext analysis. The court now turns to the analysis of the alleged comparators.

### a. Scott Herring

Plaintiff contends Scott Herring is an appropriate comparator because he was a white helper involved in "four major disciplinary determinations in 2006 and 2007, which included issues of dishonesty, insubordination, and disrespect." (Doc. 41 at 11) (emphasis omitted). Herring received a total of seven days suspension for these violations. (*Id*. at 12). Plaintiff highlights an incident in August 2007 where there was "extensive damage to a train car" and Herring was given a notice

of violating three Operating Rules[16] and General Rule 9.[17] (*Id.*; Doc. 39-6 at 120-21). Herring attempted to erase some data from his remote box immediately following the incident. (Doc. 39-6 at 122). The violations notice letter was signed by Trainmaster John Schrober. (*Id.* at 121). Herring was given a five day suspension subject to discharge that was converted to a thirty day suspension. (*Id.* at 122). There is nothing in the record as to who made the disciplinary decision. When he returned to work, Herring signed a last chance agreement. (*Id.*).

Plaintiff also points to an incident in September 2006 where Herring was "disrespectful and unprofessional" to Dan Priestas, Superintendent of Transportation, when Herring walked away from Priestas during a conversation regarding an FS Notice violation. (*Id.* at 127). The record does not evidence that Herring received any discipline regarding this incident beyond being written-up. (*Id.*).

Herring is not a suitable comparator for a number of reasons. First, as to both incidents highlighted by Plaintiff, Herring and Plaintiff violated different work rules. Plaintiff admitted he intentionally violated a Cardinal Rule, identified by FS as a life threatening rule, directed at safety. Herring did not violate this rule.

---

[16] The Operating Rules at issue involved the improper movement of trains. (Doc. 39-6 at 120). The record does not contain any specific information regarding the accident other than it caused damage to a locomotive and a railcar. (*Id.*).

[17] General Rule 9 is the same rule Plaintiff violated noted as General Rule 1.7.9 (GR-9). (*Compare* Doc. 39-2 at 123 with Doc. 39-6 at 120). The final phrase regarding "concealing facts" was in bold on Herring's notice of suspension subject to discharge. (*Id.*).

In the August 2007 incident, Herring violated three Operating Rules and, although the accident caused damage to the trains, there is no evidence of a violation of any safety rules. Instead, the violated Operating Rules deal with the improper movement of trains and the notice highlights the property damage caused, not any potential safety concerns. (Doc. 39-6 at 120).

That being said, Herring also violated General Rule 9, one of the same rules violated by Plaintiff. That rule is a catch-all dealing with disloyalty, dishonesty and insubordination, as well as "inexcusable violations of rules resulting in endangering, damaging or destroying life or property" and "concealing facts concerning a matter under investigation." (Doc. 39-2 at 123; Doc. 39-6 at 120). Herring and Plaintiff violated different portions of the rules and the circumstances surrounding those violations were different. Herring concealed facts concerning the reason for the operating rule violations. Plaintiff, on the other hand, acted in a way that made FS believe he did not take the safety rules seriously which could lead to a fatality. *See Hawkins v. Caco Corp.*, 883 F.2d 977, 985 (11th Cir. 1989) (stealing and insubordination are not similar conduct). The overarching issue that led to Plaintiff's termination was not the mere violation of the rules per se, but Plaintiff's actions in connection with the violations that indicated to Rutherford he did not take safety seriously. (Rutherford Decl. ¶ 13).

Additionally, all of Herring's discipline in the record before the court was decided by different decision makers.[18]  (Doc. 39-6 at 120-123).  Differences in "treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination."  *Silvera*, 244 F.3d at 1261 n.5; *Chapman*, 229 F.3d at 1031 n. 21 ("Different decisionmakers are entitled to be concerned about different things."); *Galdamez v. DHL Air Exp. USA*, 578 F. App'x 887, 892 (11th Cir. 2014) (alleged comparators had different supervisors and, thus, were not adequate comparators).  Moreover, Herring's August 2017 discipline was decided as part of a settlement agreement with the union.  (*See* Doc. 39-6 at 120-23).  The union did not engage in grievance procedures after the 9(b) hearing with regard to Plaintiff's violation, and, FS believed Plaintiff not was fully participating in the hearing process.  For these reasons, the court concludes Herring is not "nearly identical to the plaintiff" as required by the Eleventh Circuit.  *Holifield*, 115 F.3d at 1562.

### b.  Travis Lansford

Plaintiff also argues Travis Lansford is a suitable comparator.  Lansford was a train operator who began working for FS in March 2003.  (Johnson Dep. at 89;

---

[18] The record is not clear as to who made each of Herring's disciplinary decisions.  The only evidence in the record is the signatures on the letters and disciplinary documents.  Plaintiff certainly does not provide the court with any evidence that anyone else involved in the decision regarding Plaintiff, made any decisions involving Scott Herring.

Doc. 39-6 at 57). In February 2011, Lansford violated Cardinal Rule 21,[19] Notice 23 and General Safety Rule 70.5 on three separate occasions by dismounting a moving railcar. (*Id*. at 60, 62). There are no specific facts in the record regarding the incident leading to the violations. He was initially suspended for five days subject to discharge. (*Id*. at 60). The discipline letter was signed by Transportation Supervisor Thomas Harris. (*Id*.). FS and the union held a 9(b) hearing regarding the incident and Harris's discipline was converted to fifteen days without pay. (*Id*. at 62). Tarwater signed the letter notifying Lansford of the final discipline decision. (*Id*.).

Plaintiff also points to Lansford's disciplinary history, including eight different suspensions for various rules violations. (Doc. 41 at 12; Doc. 39-6 at 57-58). Plaintiff argues "[t]he close connection between Lansford's position and Mr. Johnson's position, as well as the disparity in treatment for rules violations between these two individuals in 2011[20] demonstrates a more favorable treatment of Mr. Johnson's white comparators." (Doc. 41 at 25). The court disagrees.

---

[19] Cardinal Rule 21 states "Engineers/Operators/Train Service personnel must not mount or dismount moving equipment, except in case of emergency." (Doc. 39-6 at 60).

[20] Although not highlighted by Plaintiff, the court notes that, in January 2010, Lansford violated an unspecified Cardinal Rule relating to leaving railroad equipment unsecured. (Doc. 39-6 at 59). There is no evidence regarding the circumstances of this violation. The discipline notice stated "[h]andbrakes, blocking or both must be used to prevent inadvertent movement." (*Id*.). Lansford was suspended for three days. (*Id*.). The discipline letter was signed by Trainmaster Darrell Ballard. (*Id*.). Without any specifics, the court cannot determine whether the "quantity and quality" of Lansford's misconduct is "nearly identical" as required by the Eleventh Circuit.

Lansford is not similarly situated in all relevant respects as required under Eleventh Circuit precedent for a number of reasons.  First, Lansford held a different position from Plaintiff.  Lansford was a train operator and Plaintiff was a helper.  Admittedly the two positions worked together as a team, but they each had different jobs and responsibilities as part of that team.  Second, Lansford and Plaintiff were disciplined for violating different rules in 2011.  Although both were violations of Cardinal Rules and both rules dealt with safety, there is no indication FS believed Lansford did not take safety seriously or that he did not cooperate in the hearing procedures.   Rutherford testified the key factors that led to Plaintiff's termination were not the mere violation of the rules, but that Plaintiff violated the Cardinal Rule intentionally, and his actions following the violation indicated to Rutherford he did not take safety seriously.  (Rutherford Decl. ¶ 13).  As such, "the quantity and quality" of  Lansford's misconduct is not "nearly identical to prevent [the] court[] from second-guessing employers' reasonable decision[] and confusing apples with oranges."[21]  *Maniccia*, 171 F.3d at 1368 (quotations omitted).

---

[21]   The court rejects Plaintiff's argument that Lansford's work history showing multiple violations somehow bolsters the comparison between the two.   Lansford had been working for Defendant for over six years when Plaintiff was hired.  Additionally, the discipline records and reports logs do not explain the violations, decision makers, reasoning behind the decisions, and/or the grievance process.  Without such information, the court cannot make the requisite evaluations.

### c. Garrick Pennington

Plaintiff next points to Garrick Pennington as a suitable comparator. Pennington was employed as a helper, and on July 31, 2011, he violated Cardinal Rule 19, Operating Rule 4.12 and General Regulation 841 when he failed to sufficiently tie hand brakes before leaving his railcar. (Johnson Dep. at 140, 146; Doc. 39-5 at 70). The violation notice states Pennington "admitted to applying one hand brake and not two" and that he "got in a hurry and lost [his] train of thought." (Doc. 39-5 at 70). The notes from the intervention interview following the incident state that Pennington "knew he did wrong." (*Id*. at 71). Pennington was suspended for ten days for the violations. (Doc. 39-5 at 70). The discipline letter was signed by Tarwater. (*Id*.). There is no documentation regarding a 9(b) hearing or union grievance procedure. Plaintiff testified Pennington's 9(b) hearing was cancelled when his hearing was cancelled the first time, (Johnson Dep. at 143), but there is no other evidence regarding whether Pennington had a hearing or the ultimate discipline decision.

Pennington is a better comparator than Herring and Lansford, but he still does not pass muster. Pennington and Johnson violated the same Cardinal Rule, Operating Rule and General Regulation by failing to secure the hand brake. Like Johnson, Pennington admitted the failure when asked. That is where the similarities end, however. The evidence shows Pennington's violation was the

product of a mistake – "he got in a hurry and lost [his] train of thought." (Doc. 39-5 at 70). Johnson, on the other hand, told Tarwater he made a conscious decision not to apply the handbrake and that everyone does it that way. (Johnson Dep. at 136-37; Doc. 39-5 at 54). Johnson also violated two General Rules relating to insubordination, quarrelsome behavior, and willful neglect or carelessness regarding safety, among other things, due to his behavior after the accident. (Doc. 39-5 at 54). Further, FS believed Pennington expressed remorse regarding the violation, (doc. 39-5 at 71), whereas FS believed Johnson did not take the safety violation seriously, (Rutherford Decl. ¶¶ 7, 13; Tarwater Dep. at 48-50). As such, the court cannot conclude Pennington and Johnson are nearly identical as required.[22] *See Taylor v. On Tap Unlimited, Inc.,* 282 F. App'x 801, 803-04 (11th Cir. 2008) (alleged comparator was not similarly situated to plaintiff for violating same work rule because plaintiff's conduct was "likely the product of intentional misconduct," whereas comparator's conduct was a "mistake"); *Garner v. Wiregrass Mental Health, Inc.* , 2006 WL 861354, at *6 (M.D. Ala. Mar. 31, 2006)

---

[22]   Plaintiff also states "Pennington has a history of rule violations." (Doc. 41 at 13). The citation given by Plaintiff does not support this statement. The evidence includes only two discipline records – the one from July 2011 discussed above and a five-day suspension subject to dismissal in 2012. From what the court can discern from the record regarding the 2012 discipline, Pennington did not report for his assigned job and this failure was considered insubordination. (Doc. 39-5 at 73). This violation involves different rules and they are not of comparable seriousness. Additionally, the disciplinary note does not state the decision makers, reasoning behind the decisions, and/or the grievance process. Without such information, again, the court cannot make the requisite evaluations.

(employee not similarly situated to plaintiff even though he violated a similar work rule because he "acknowledged mistake and promised not do to do it again," whereas plaintiff did not "acknowledge[] his mistake or ma[ke] any promises not to engage in the same behavior in the future" and "displayed a defiant attitude" about the rule violation).

### d. Joey Simmons

The last comparator alleged by Plaintiff is Joey Simmons. Simmons was hired as a helper on the same day Plaintiff was hired. (Dalton Dep. at 158). Plaintiff highlights Simmons's "multiple incidents of discipline, including discipline for a Cardinal Rule violation . . . , causing a train derailment . . ., and sleeping on the job, . . . all on separate occasions." (Doc. 41 at 13). Plaintiff also contends someone told him that Simmons failed to tie a hand brake a few days before Plaintiff's accident, but was not charged with a rules violation.[23] (Johnson Dep. at 71-77, 97-98).

Simmons is not a suitable comparator because the quantity and quality of the Simmons's misconduct is not nearly identical to that of Plaintiff's. Regardless of what Johnson was told happened a few days before his accident, the evidence in

---

[23] Plaintiff did not have any personal knowledge about this situation, but testified Anthony Olds told him about it. (Johnson Dep. at 72-74). Olds stated in his affidavit that he saw Simmons knock a brake off a car while he was walking behind it and the car rolled away. (Olds Aff. at 3). Olds further stated that when he called the supervisors to let them know what happened, Andrea, a female African American supervisor, told him Simmons did not touch the car. (*Id*. at 4). This situation is clearly distinguishable from Plaintiff's accident and aftermath.

the record shows in July 2011, Simmons was involved in an incident where he allowed dirt to build up on a railcar crossing which led to a car derailment. (Doc. 39-5 at 75). There is no indication this incident violated a Cardinal Rule, or any specific rule for that matter, and there is no evidence that FS believed Simmons was not taking safety seriously. (*Id*. at 74-75). The interview intervention form documenting the incident stated "Simmons committed to obeying all safety rules" and had "a good attitude toward doing his job safely."[24] (*Id*. at 75). In contrast, FS believed Johnson's actions following the violation indicated he did not take safety seriously. (Rutherford Decl. ¶ 13). Additionally, there is evidence that Simmons violated a Cardinal Rule on April 26, 2013. The letter notice states that he "failed to properly stop for the radiation detector and allowed [his] helper to ride the side of a car into a close-clearance building." (Doc. 39-5 at 78). The notice further stated that Simmons "failed to maintain proper control of [his] train or … obey the verbal commands of [his] helper," resulting "in a collision with a bumping block causing substantial damage." (*Id.*) Simmons received a five day suspension that was later converted to a discharge following an appeal.[25] (Doc. 39-

---

[24] The court notes that Simmons had a prior, unspecified incident in 2010. (Dalton Dep. at 158). He also was found to be sleeping on the job in July 2012, which resulted in a single day suspension. (*Id*. at 155; Doc. 39-6 at 98, 107).

[25] The court cannot state with certainty why he was terminated in July 2013. (*See* Doc. 39-6 at 98). However, it appears the discharge was based on the allegations that he failed to maintain proper control of his train and obey the verbal commands of his helper. (Doc. 39-5 at 78; Doc. 39-6 at 98, 102).

5 at 74, 78-79; Doc. 39-6 at 99).  Simmons participated in the union grievance

procedure, however, and his termination appeal was settled via the union.  His

termination was converted to a resignation with notice.  (Doc. 39-6 at 105).   As

such, "the quantity and quality" of Simmons's misconduct is not "nearly identical

to prevent [the] court[] from second-guessing employers' reasonable decision[] and

confusing apples with oranges."[26] *Maniccia*, 171 F.3d at 1368 (quotations

omitted).

In summary, none of the individuals identified by Plaintiff are suitable

comparators under Eleventh Circuit law.[27]  Plaintiff cannot rely on individuals with

---

[26] The court again notes that the record does not evidence who made the various decisions concerning Simmons's disciplinary that led to his termination.  The only evidence in the record is the Wayne T. Hosmer signature on the letter and the name Daniel D. Webb on the Personnel Change Authority form.  (*See* Doc. 39-5 at 78-79; Doc. 39-6 at 99).   Plaintiff does not provide the court with any evidence that anyone else involved in the decision regarding Plaintiff, made any decisions involving Simmons.

[27]  The court notes Defendant also presented evidence of African American employees, supervised by Tarwater and Rutherford, who committed single Cardinal Rule violations, and were not discharged based on the totality of the circumstances.  (Rutherford Aff. ¶¶ 19a-d).  This calls Plaintiff's allegations of disparate treatment into doubt, and highlights the importance of the circumstances other than the mere violation of the Cardinal Rule that led to his termination.  *See Davis v. Dunn Const. Co., Inc.*, 872 F. Supp. 2d 1291 (N.D. Ala. 2012) (the fact that African American employees were paid more than Plaintiff calls his allegations of disparate pay into doubt) (citing *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 642 (3d Cir. 1998) (holding "that a plaintiff does not create an issue of fact merely by selectively choosing a single comparator who was allegedly treated more favorably, while ignoring a significant group of comparators who were treated equally to her"); *Bush v. Commonwealth Edison* Co., 990 F.2d 928, 931 (7th Cir. 1993) (a "plaintiff cannot establish a prima facie case of racial discrimination by showing that, in a large department, a coworker of another race was treated more favorably than other coworkers of other races. Such a pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination.")).

different positions and supervisors, who violated different work rules, and behaved differently after the occurrence of the violation. Because Plaintiff failed to establish a similarly situated comparator who was treated more favorably than he was treated, he did not establish a prima facie case. That being said, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield*, 115 F.3d at 1562 (citing *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989) (emphasis added)). The court, therefore, turns to Plaintiff's evidence of discrimination and pretext argument.

### 2. Defendant's legitimate, nondiscriminatory reason and Plaintiff's evidence of pretext

Defendant has carried its "exceedingly light" burden of articulating legitimate, nondiscriminatory reasons for Plaintiff's termination. As discussed in detail above, Johnson was terminated because FS believed he intentionally violated a Cardinal Rule, expressed a poor attitude about safety, refused the request to talk to other employees about the violation, and failed to fully cooperate in attempts to conduct a hearing. (Rutherford Decl. ¶ 13).

Because Defendant satisfied its burden of production of legitimate, non-discriminatory reasons for Plaintiff's termination, Plaintiff must come forward with evidence sufficient to permit a reasonable fact finder to conclude the reasons stated were pretextual. *Burdine*, 450 U.S. at 253. Plaintiff may do so by

demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1348-50 (11th Cir. 2007). Importantly, conclusory allegations of discrimination, without more, are insufficient to show pretext. *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996). "A reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006).

To show pretext, a plaintiff may not merely quarrel with the wisdom of the employer's reason but must meet the reason head on and rebut it. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010); *Chapman*, 229 F.3d at 1034. The inquiry into pretext is based on "the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield*, 115 F.3d at 1565. As the Eleventh Circuit explained, "to be blunt about it," the inquiry does not center "on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (explaining the question is not whether the employee actually had performance problems but "whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or

instead merely used those complaints . . . as cover for" discrimination). "Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval [an employer's] practices, no matter how high-handed its decisional process, no matter how mistaken the [employer's] managers, [Title VII] does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir. 1988)).

Plaintiff makes four arguments in an attempt to establish pretext. First, he argues that the some of the reasons stated for his termination are unworthy of credence in that they are either untrue or created after-the-fact. (Doc. 41 at 18-22, 28-29). Johnson next asserts FS's failure to preserve his employment file is evidence of pretext. (*Id*. at 27). Third, Johnson argues the reasons stated by FS are inconsistent and contradictory. (*Id*. at 28). Finally, Johnson contends his removal from payroll before his termination indicates the decision to terminate Johnson was made before the 9(b) hearing. (*Id*. at 28-29). The court addresses each argument in turn.

As to Plaintiff's first pretext argument, Johnson contends the reasons for his termination are unworthy of credence because (1) there is at least a question of fact as to whether the "huh" in response to Tarwater's question could be interpreted as

a laugh; (2) the request to talk to other employees about the safety violation was "unprecedented"; and (3) it was not his fault he did not attend the 9(b) hearing and FS rescheduled it when its employees could not be present. These arguments miss the mark. Instead, Johnson is merely quarreling with the reasons stated by FS for his termination. Whether or not Johnson laughed is not the issue, it is undisputed FS believed he did not take his safety violation seriously. The same is true as to the hearing. It does not matter that he contends he did not know about it or it was rescheduled a number of times because either he or FS employees could not attend. What matters is that FS believed he was not participating in the hearing procedure. He can dispute whether the conclusions were correct, but such an argument is not sufficient under the law. *See Elrod,* 939 F.2d at 1470. The pretext inquiry "centers on the employer's beliefs." *Alvarez*, 610 F.3d at 1266 (citing *Holifield*, 115 F.3d at 1565); *Giraldo v. Miami Dade College*, --- F. App'x ---, 2018 WL 3342292. *2 (11th Cir. July 9, 2018).

As to the request by Rutherford that Plaintiff speak to others about the violation, Plaintiff contends the request was "unprecedented," and that there is no evidence "[i]n the hundreds of pages of discipline files received from Fairfield Southern in the discovery process in this case," documenting such a request of another employee. (Doc. 41 at 21). Johnson is again disagreeing with one of the

reasons stated[28] by FS for his termination.  That he would not participate in such measures signaled to Rutherford, the decision maker, that Johnson did not understand the severity of his conduct.  (Rutherford Aff. ¶ 8).  It is what is in Rutherford's mind, not Johnson's mind that counts.  Additionally, the court is not concerned with whether the decision was "prudent or fair."  *Rojas*, 285 F.3d at 1342.  Regardless of whether FS asked other employees to speak with their fellow employees about rules violations, the Eleventh Circuit has repeatedly stated that the court does not sit "as a 'super-personnel department,' and it is not [the court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."  *Alvarez*, 610 F.3d at 1266 (quoting *Chapman*, 229 F.3d at 1030).

The "sole concern is whether unlawful discriminatory animus motivated" the termination.  *Alvarez*, 610 F.3d at 1266.  For purposes of Rule 56, the court is not concerned with whether Plaintiff actually committed the violations but whether Defendant honestly believed Plaintiff engaged in the misconduct.  "An employer who fires an employee under a mistaken but honest impression that an employee violated a work rule is not liable for discriminatory conduct."  *Damon v. Fleming*

---

[28] In fact, he even quarrels with the terminology and the way in which different deponents explained the request.  (Doc. 41 at 21).

*Supermarkets of Fla., Inc*., 196 F.3d 1354, 1363, n.3 (11th Cir. 1999). For these reasons, Plaintiff's first pretext argument fails.

Plaintiff's next pretext argument centers around FS's failure to preserve Johnson's employment file. (Doc. 41 at 27). It is undisputed Johnson's personnel file "went missing" sometime after his termination, apparently around December 2012, before Johnson filed his EEOC charge. (Baginski Dep. at 17; Doc. 39-7 at 36). There is absolutely no evidence, however, that the loss of his file was due to bad faith, *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (an adverse inference is drawn from failure to preserve evidence when the absence of that evidence is predicated on bad faith), and Plaintiff has not filed a motion for an adverse inference based on spoliation. Without such allegations, the mere fact that the employment file is missing does not help Plaintiff's pretext argument. Instead, the evidence shows Defendant attempted to locate Plaintiff's file and recreated Plaintiff's employment file to the best of its ability when it realized it was missing. (Doc. 39-7 at 39-40). Plaintiff certainly has not accused Defendant of anything other than negligence. Without more, the negligent loss of Johnson's personnel file does not establish pretext.

Third, Plaintiff contends "[i]nconsistencies and contradictions are rampant in Fairfield Sothern's explanations" for the termination decision. (Doc. 41 at 28). Although an employer's shifting and inconsistent explanations may be evidence of

pretext, *Cleveland v. Home Shopping Network, Inc*., 369 F.3d 1189, 1194-95 (11th Cir. 2004), the record does not support Johnson's contention that Defendant gave inconsistent reasons for his termination.  FS has consistently maintained Johnson was terminated because FS believed he intentionally violated a Cardinal Rule, expressed a poor attitude about safety, refused the request to talk to other employees about the violation, and failed to fully cooperate in attempts to conduct a hearing.  (Rutherford Decl. ¶ 13).  That explanation has not changed.  In fact, every explanation regarding Johnson's termination centers on his actions and attitude toward safety as viewed by FS after the accident.   Defendant has not given different explanations for Plaintiff's termination, as required to establish pretext. *Compare Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 935 (11th Cir. 1997) (finding evidence of pretext due to shifting explanations where employer explicitly denied in district court employee's job performance was basis for termination but on appeal argued employee's layoff was solely due to poor performance).

Finally, Johnson's removal from payroll after August 27, 2011, a month before his final hearing, does not establish pretext.  Johnson was paid in August 2011 for the days he worked in July 2011.  (Doc. 39-3 ("Hart Decl.") at ¶ 4). There is no earnings history report for Johnson after August 27, 2011, because he was suspended subject to discharge and did not receive any pay from FS.  (*Id*.).

For the reasons stated above, Plaintiff has failed to establish the legitimate, nondiscriminatory reasons for his termination were a pretext for race discrimination.   As such, Defendant is entitled to summary judgment on Plaintiff's claim he was terminated in violation of Title VII.[29]

IV.    CONCLUSION

For the foregoing reasons, Defendant Fairfield Southern Company, Inc.'s motion to strike (doc. 44) is due to be granted.  Defendant is entitled to judgment as a matter of law on all claims asserted by Plaintiff.  Defendant's motion for summary judgment, therefore, is due to be granted.  (Doc. 37). A separate order will be entered.

**DATED**, this 7th day of September, 2018.

_John E. Ott_

**JOHN E. OTT**
Chief United States Magistrate Judge

---

[29] Because of this conclusion, the court does not have to make a decision about the limitations to Plaintiff's damages.